```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                   :
UNITED STATES OF AMERICA
                                   :      12 Cr. 505 (GBD)
          - v. -
                                   :
SATNARINE SEEBACHAN,
                                   :
          Defendant.
                                   :
- - - - - - - - - - - - - - - - - x
```

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**


                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York,
                                        Attorney for the United States
                                             of America


CARRIE H. COHEN
Assistant United States Attorney
     - Of Counsel -



*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

June 19, 2014

**By ECF and Hand Delivery**

The Honorable George B. Daniels
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

      **Re:  United States v. Satnarine Seebachan,**
            **12 Cr. 505 (GBD)**

Dear Judge Daniels:

    The defendant Satnarine Seebachan ("Seebachan" or "the defendant") is scheduled to be sentenced in the above-referenced case on June 27, 2014 at 12:30 p.m.  The Government respectfully submits this letter in advance of that sentencing and in response to the defendant's submission dated April 23, 2014 ("Def. Mem.").

    The United States Probation Office (the "Probation Office") in its Presentence Investigation Report, including the recommendation and addendum, dated January 22, 2014 ("PSR" or "Presentence Report"), recommends a sentence of 27 months' imprisonment, which is the bottom of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range as correctly calculated by the Probation Office of 27 to 33 months' imprisonment.  The defendant seeks a non-custodial sentence or an intermitted sentence to be served on weekends.  For the reasons set forth below, the Government believes that a sentence within the Guidelines range of 27 to 33 months' imprisonment is sufficient but not greater than necessary to serve the legitimate purposes of sentencing, especially in light of seriousness of the offense and the defendant's breach of trust to his not-for-profit corporation employer and the community it serves.

## BACKGROUND

**A.    The Indictment**

Indictment 12 Cr. 505 (GBD) (the "Indictment") was filed on July 16, 2012 and charged the defendant with One Count of bribery. Specifically, Count One of the Indictment charged the defendant with soliciting and accepting at least $5,000 worth of labor and supplies directly and indirectly from a contractor in exchange for assisting and/or promising to assist that contractor in obtaining work from a not-for-profit corporation that employed the defendant, in violation of Title 18, United States Code, Section 666(a)(1)(B).   (PSR ¶¶ 1-2).

**B.    The Trial and Guilty Verdict**

Trial began on September 17, 2013 and concluded on September 23, 2013 when the jury returned a verdict of guilty on the Indictment.

    **1.    The Government's Case**

As demonstrated at trial, the defendant was employed as a program director by Bronx Shepherds Restoration Corp. ("Bronx Shepherds"), a not-for-profit corporation in the Bronx that provides housing restoration to income eligible individuals.  As explained by Bronx Shepherds Board Member and First Vice President Reverend Anthony Lowe, Bronx Shepherds has a long tradition of providing safe and affordable housing to residents of the South Bronx, many of whom live at or below the poverty line.  As a Program Director at Bronx Shepherds, the defendant was responsible for administering, among other things, two federal funded home improvement programs, namely, the Weatherization Assistance Program ("Weatherization Program") and the Home Program ("Home Program") (collectively, the "Programs").  (Trial Transcript ("Tr.") 120-26 (Rev. Lowe testimony); PSR ¶¶ 7, 12).

As explained by Thomas Carey, Director of Energy and Rehabilitation Services, New York State Division of Housing and Community Renewal ("DHCR"), and demonstrated through documents introduced into evidence by the Government, the Weatherization Program is a federal program funded by the U.S. Department of Energy and the U.S. Department of Health and Human Services.  The Weatherization Program provides weatherization assistance, such as improved lighting and heating systems, window caulking, and wall and ceiling insulation, to buildings with low-income residents in order to make the buildings more energy efficient.  The Home Program is a federal program funded by the U.S. Department of Housing and Urban Development.  The Home Program provides non-luxury renovation

2

assistance to low-income individuals who reside in small family homes, such as repairs to ceilings, bathrooms, kitchens, windows, and sidewalks. The Programs both administer their federal funds through the DHCR to not-for-profit corporations in New York City, including Bronx Shepherds. (Tr. 46-66, 81-114 (Casey Testimony); PSR ¶¶ 8, 9).

In connection with the defendant's administration of the Programs, he was in charge of the bidding process to select the construction companies hired to perform the necessary work on the buildings, apartments, and houses that Bronx Shepherds had selected to participate in the Programs. The rules and regulations of both Programs prohibited self-dealing and conflicts of interest, meaning that individuals who administered the Programs could not solicit for themselves, their family, or their friends, work or payment of bills by contractors who performed work under the Programs. (Tr. 46-66 81-114 (Casey Testimony); Government Exhibit ("GX") 381, 382, 385, 385A, 386, 387).

In or about the end of 2005, the defendant purchased a new home for himself in Glen Cove, New York. (GX 101, 102, 113 (photographs of house at purchase); Tr. 126-36 (Prior Home Owner Christopher Andolina Testimony)). Shortly after the defendant purchased the house and again in 2010, the defendant solicited bribes from Fotis Papadatis ("Papadatis") who owned YES Contracting (later renamed Verizon Contracting) (collectively, "YES Contracting"), for home improvements. The defendant knew Papadatis because YES Contracting had bid for and received contracts from Bronx Shepherds to perform renovation work under the Programs.

As explained by Papadatis, who testified pursuant to court-ordered immunity, and two YES Contracting employees who Papadatis paid to work at the defendant's house, the scope of work YES Contracting performed at the defendant's home consisted of extensive concrete beautification on the driveway, front walkway, and pool area. (Tr. 138-206, 243-355 (Papadatis Testimony); 487-97 (Alejandro Perez Testimony), GX 1100A; Tr. 498-503 (Reniel Contreras Testimony); GX 103, 104, 105, 106, 107R, 108R, 109R). Concrete Beautification is a process through which concrete is poured, colored, and stenciled to make it appear similar to textured brick or pavers. (Tr. 356-70 (Part-Owner Concrete Technology, Inc. ("CTI") Brad Hieneman Testimony)). In addition, Papadatis paid for certain types of marble totaling $44,500 that were supplied and installed in the defendant's home by Ionian Marble, Inc., representatives of which also testified at trial. (GX 200, 200A-D, 201, 201A, 202, 202A-B; Tr. 539-71 (Ionian Marble owner Assinakis Ingilis and his wife Maria Ingilis Testimony)).

3

At the time Papadatis performed the concrete beautification work at the defendant's house and paid for the initial marble, the defendant told him, in sum and substance, that the defendant would make it worth his while and would help him win large contracts to perform repairs on apartment buildings Bronx Shepherds owned and managed. When Papadatis asked the defendant to be paid for the concrete beautification work he and his employees had performed at the defendant's house, which he valued as worth $90,000 to $100,000, the defendant paid him only $20,000 but again promised to steer other contracts with Bronx Shepherds to him. When Papadatis continued to ask the defendant for payment for the work he had performed at his house, the defendant repeatedly promised Papadatis more work from Bronx Shepherds, including the lucrative contracts for buildings owned by Bronx Shepherds. (Tr. 285, 290-91, 297-301).

Despite the defendant's promise to award Papadatis other lucrative contracts to work on Bronx Shepherds's owned buildings, the defendant gave Papadatis numerous excuses why that work could not yet be rewarded to him and then, after Papadatis had performed all the concrete beautification work to the defendant's house and Papadatis had paid the last marble bill, the work never materialized (other than the increase in contracts under the Programs as set forth below). (Tr. 297-301). Indeed, the evidence showed that the defendant lied to Papadatis about the lucrative contracts – used them as a fiction to induce Papadatis to accept the bribe - as there never were any big contracts to be awarded for the buildings owned by Bronx Shepherds. As Debbie Thomas, Property Manager at Bronx Shepherds, explained at trial, the largest amount of money paid to a contractor to perform repair work on Bronx Shepherds owned buildings was $20,000 and she never even heard of Papadatis or his company. (Tr. 573).

As further proof of the bribery scheme, the Government presented evidence that Papadatis's contracts with Bronx Shepherds pursuant to the Programs increased significantly after the defendant solicited and accepted the bribe and that many of those contracts contained forged Papadatis signatures. (Tr. 323-55). Specifically, prior to the defendant soliciting the bribe from Papadatis, Papadatis received only eight contracts from Bronx Shepherds; four contracts totaling $31,000 in 2004 and four contracts totaling $48,000 in 2005. (GX 700A-D and 701A-D, respectively). In 2006, after the defendant had soliciting the bribe from Papadatis and Papadatis began work on his house and paid for some of the marble, Papadatis received 34 contracts totaling $120,000. (GX 702 series). The Government established that this pattern of increased contracts continued through March 2010, the date Papadatis paid the last marble bill for approximately

4

$17,000.  (GX 703 series through GX 706 series; GX 202, 202A-B).  In addition, after Papadatis paid the last marble bill, the Government established through Papadatis's testimony that there were no more forged contracts.  (Tr. 323-55).

Accordingly, all the evidence demonstrated that the defendant had solicited and accepted a bribe from Papadatis by promising contracts from Bronx Shepherds in exchange for free home renovations and payment of marble bills related to the renovations.

### 2. The Defense Case

The defendant did not call any witnesses at trial but read a stipulation into evidence concerning dates the Government met with its witnesses.  (Tr. 606-07).

### C. The Probation Office's Guidelines Calculation and Recommendation

The Probation Office calculated a total Guidelines offense level of 18, the same as the Government had calculated in the *Pimentel* letter it sent to the defendant prior to trial.  (PSR ¶ 31).  This calculation was based on (1) a base offense level of six pursuant to U.S.S.G. § 2B1.1(a)(2); (2) a ten-level increase based on the amount of the bribe (more than $120,000 but less than $200,000) pursuant to U.S.S.G. § 2B1.1(b)(1)(F); and (3) a two-level increase based on the defendant's abuse of a position of private trust and use of a special skill in a manner that significantly facilitated the commission of the offense pursuant to U.S.S.G. § 3B1.3.  (PSR ¶¶ 23-31).  The Probation Office calculated that the defendant's Criminal History Category was I, yielding a Guidelines range of 27 to 33 months' imprisonment.  (PSR ¶ 35 and 17).

The defendant contests two components of the Probation Office's calculation.  First, the defendant challenges the two-level enhancement for abuse of trust under Section 3B1.3 claiming that the enhancement already is included in the underlying offense.  (Def. Mem. at 7).  The defendant's bribery charge, however, does not inherently require that a defendant occupy a position of trust within a private entity, and thus the defendant's argument is without merit. Moreover, when the Section 3B1.3 abuse of trust enhancement is included in the underlying offense, such as honest services fraud under Section 2C1.1, the Guidelines specifically so note and instruct that the enhancement should not apply.  *See* U.S.S.G. § 2C1.1

5

Application Note 6.[1]  As no such instruction applies to the defendant's base offense level under Section 2B1.1 (as opposed to under Section 2C1.1), defendant's argument that the abuse of trust enhancement does not apply should be rejected.

Second, the defendant challenges the loss calculation and claims a *Fatico* hearing is necessary to resolve the issue.  The defendant claims that the $144,445 loss amount is based on a "flawed numerical value placed on the renovation work" by Papadatis; fails to deduct the $20,000 the defendant paid to Papadatis; and fails to deduct the $40,000 worth of equipment Papadatis bought from CTI to be used at the defendant's home as well as on other jobs.  (Def. Mem. at 6).  As an initial matter, a *Fatico* hearing is not necessary as all relevant evidence on this issue was introduced at trial.

The $144,445 loss amount is comprised of two components:  1) $44,445 represents the total of the three marble bills paid for by Papadatis (GX 200, 201, and 202); and 2) $100,000 representing Papadatis's estimate of the amount he would have charged an individual to perform the concrete beautification work that he performed at the defendant's home.  (Tr. 291).  In estimating the cost of the concrete beautification work Papadatis performed at the defendant's home, Papadatis did not include, although he legitimately could have done so, the $40,000 CTI cost, which was the cost of CTI's training class as well as the materials for the concrete beautification work.  (Tr. 291, 273).  Accordingly, the defendant simply is wrong that the $40,000 CTI cost was included in Papadatis's $100,000 estimate of cost of work.  Even assuming *arguendo* that the CTI cost was included, it was legitimate to do so as the defendant was the one who suggested that Papadatis travel to CTI in Florida to attend training in order to perform the concrete beautification work at his house and the materials Papadatis purchased from CTI were used on the defendant's house.  (Tr. 268).

---

[1] In support of his argument, the defendant cites to Section 2F1.1(a), (Def. Mem. at 8), but that Section has been "deleted" from the applicable Guidelines Manual.  Relatedly, the defense cites to *United States* v. *Broderson*, 67 F.3d 452 (2d Cir. 1995), in which the defendant was convicted of eleven counts of executing a major fraud scheme in connection with the defective pricing of a government contract and the Second Circuit held that the abuse of trust enhancement was included in the base offense under Section 2F1.1.  (Def. Mem. at 8).  As Section 2F1.1 has been deleted and the current applicable Guidelines Section 2B1.1, in contrast to Guidelines Section 2C1.1, does not exclude the separate application of the abuse of trust Guideline, the *Broderson* case is not binding or applicable here.

Finally, the $100,000 should not be discounted by any money paid by the defendant in cash to Papadatis as the loss amount refers to intended loss. Moreover, the $20,000 in cash easily could be interpreted as a bribe or could have been paid to Papadatis to reimburse him for the incurred costs travelling to Florida for training at CTI and purchasing materials from CTI. Accordingly, the $144,445 amount is the correct loss amount and the defendant's objections thereto should be rejected without a hearing.

Based on a Guidelines range of 27 to 33 months' imprisonment, the Probation Office recommends a sentence at the bottom of the Guidelines range of 27 months' imprisonment; two years of supervised release; and a $100 mandatory special assessment. (PSR at 17.)

For the reasons set forth below, the Government believes that a sentence within the Guidelines range is necessary in order to serve the legitimate purposes of sentencing.

## DISCUSSION

Despite a Guidelines range of 27 to 33 months' imprisonment and the Probation Office's sentencing recommendation of 27 months' imprisonment, the defendant seeks a non-custodial sentence or, in the alternative, an intermitted sentence to be served on weekends. (Def. Mem. at 1). The defendant bases his request on his (1) "exceptional employment history;" 2) "hardship to the family;" and 3) "aberrational conduct." (Def. Mem. at 3). None of these arguments, however, support a non-Guidelines sentence.

First, with respect to his long-term employment history at Bronx Shepherds, even the defense recognizes that it "seems counterintuitive for a defendant to stand on his years of service as a basis for leniency at sentencing, when the abuse of that employment stands at the basis of the conduct of conviction." (Def. Mem. at 11). Indeed, for more than five years while the defendant administered federal programs designed to help residents of the South Bronx, "one of our nations most vilified an economically depressed and dysfunctional communities," (Def. Mem. at 2), the defendant violated the trust his not-for-profit employer placed in him by engaging in self-dealing and corrupting that organization's bidding process in order to fund lavish personal home renovations. While the defense argues that the defendant was committed to the "Bronx community" that he was entrusted with serving, (Def. Mem. at 11), the defendant was not acting in the interest of that community when he jeopardized the federal programs by engaging in self-dealing to finance expensive personal home renovations.

In addition, while individuals often engage in criminal conduct for the money, unlike many of those defendants, the defendant was gainfully employed at the time by Bronx Shepherds and rather than use such income to renovate his house, he choose to abuse his position to obtain expensive home renovations for free. Accordingly, the defendant's long employment history with Bronx Shepherds does not mitigate in favor of a non-Guidelines sentence.

Second, regarding the defendant's family circumstances, the defendant claims that "[a]s a result of his wife's permanent disability," he is "the only adult who provides financial support for his family" and is the "primary care giver to their two children," one of whom is in college. (Def. Mem. at 3, 12). The defendant's wife and minor child have been collecting disability benefits since 2005 when the Social Security Administration ("SSA") determined that a back injury the wife sustained in a 2002 car accident rendered her "fully disabled," (PSR ¶ 47), as she was unable to stand or sit for long periods of time, needed help to do her own hair and prepare meals, and was in constant pain. The defense, however, presents no proof to this Court that, almost ten years after that determination, the defendant's wife still is fully disabled and the SSA does not require any such proof after its initial determination of disability (it is up to the individual receiving the benefits to notify the SSA that s/he no longer suffers from the disability).

Indeed, during the course of the investigation, the Government found numerous examples, including facebook postings, utube videos, and other internet postings, where the defendant's wife was leading an active and productive life with no evidence of any back impairment or injury or constant pain. For example, the defendant's wife works as the manager of the defendant's band, called the G6 Revolution Band, even travelling abroad with them, and has hosted a thrice weekly radio show as well as being the manager of XposedTV, which works to get music on television. In addition, Government investigators observed the defendant's wife pushing a stroller, climbing into her Hummer without incident, and shopping during which she was able to easily left heavy objects, such as a baby car seat as well as reviewed photographs of the defendant's wife engaging in certain leisure activities, including driving herself to the Hamptons and sipping champagne at her pool. Further, the defendant's wife travels abroad to Canada and Trinidad for family vacations twice annually.

According, the defendant's claim that due to his wife's alleged disability, she will not be able to work and support the family during any period of his incarceration is called into serious question. Moreover, the defendant appears to have family and friends who may

8

be able to assist his family during any period of imprisonment. (PSR ¶¶ 41, 42, 72). The defendant's family circumstance, thus, also do not mitigate in favor of a non-Guidelines sentence.

    Third, the defense argues that the defendant's "criminal conduct was clearly an aberration in an otherwise remarkable life. . ." and a "single indiscretion." (Def. Mem. at 11). Rather than a "single" act, the defendant's bribery scheme was comprised of multiple acts during a five year time period from 2006 through 2010, a period during which Papadatis received increased numbers of contracts many of which contained forgeries of his signature. As the Court is aware from the evidence at trial, the defendant solicited Papadatis to pay the first marble bill in early 2006; solicited Papadatis to perform extensive concrete beautification work at his house during the summer of 2006; solicited Papadatis to pay the second marble bill in the fall of 2007; solicited Papadatis to fix cracks in the concrete sometime in 2008 or 2009; and then solicited Papadatis yet again to pay another marble bill in early 2010.

    Moreover, during this five year time period, in order to keep Papadatis induced to perform work for free and pay his marble bills, the defendant continued to lie to Papadatis and falsely promise Papadatis that he would be awarded large contracts for renovation work at buildings owned and managed. Accordingly, rather than an "aberration" or a "single indiscretion," the defendant's corrupt criminal conduct was his regular and normal way of obtaining renovations of his house for free.

    Additionally, the defendant's argument that his conduct was an aberration because it was limited to Papadatis similarly is not persuasive. As the Court is aware from pretrial motions, if the defendant had chosen to testify at trial, the Government would have cross-examined him on his use of other Bronx Shepherds's contractors to perform renovation work on his house and his use of their contractor discount as well as the defendant's use of yet another Bronx Shepherds's contractor to help pay the down payment on his new home. Relatedly, the defendant's claim that the Government did not call into question his explanation for obtaining $300,000 in cash during the same period as his bribery scheme, (Def. Mem. at 4), is disingenuous as the Government's pretrial motion demonstrated that the defendant's proffered story about the source of the cash was specious, at best.[2]

---

[2] After the April 2010 proffer session referred to by the defendant in its submission, (Def. Mem. at 4), and as fully set forth in the Government's pretrial motion, Government investigators spoke to the defendant's mother and uncle both of whom the defendant claimed were the source of the $300,000

Further, a Guidelines sentence would serve the purpose of affording adequate deterrence to similarly situated defendants. Id. § 3553 (a)(2)(B). It is important to deter other individuals who administer government programs for not-for-profit organizations by whom they are employed from abusing their trust and corrupting bidding processes and procedures designed to prevent self-dealing and conflicts of interest.

Finally, and more generally, the Guidelines, are by no means arbitrary; rather, they are the product of deliberate, evolving, and thoughtful consideration of crime and appropriate punishments. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id*. at 596. *See also United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

The Guidelines remain a fundamental starting point for determining a defendant's sentence; they should not be disregarded particularly where, as here, the nature and seriousness of the offense support a Guidelines sentence. In addition to recognizing the nature and seriousness of the offenses, a Guidelines sentence also would serve the purposes of affording adequate deterrence to similarly situated defendants. *See* 18 U.S.C. §§ 3553 (a)(2)(B) and (a)(6).

---

in cash and they stated, in sum and substance, that the defendant's family had a small vegetable stand in Trinidad but that it never had made any significant amount of money. Accordingly, the defendant's convoluted story about the source of the cash being proceeds from a vegetable stand in Trinidad is not only incredible on its face but was contradicted by two different individuals, both of whom are related to the defendant and thus presumably would have tried to support his account.

10

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the applicable Guidelines range, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: /s/
Carrie H. Cohen
Assistant United States Attorney
Tel.: (212) 637-2264

cc: Anthony L. Ricco, Esq. (by ECF and e-mail)